But thank you. So now you can begin and thank you for being here. Thank you. Good morning, your honors, and may it please the court, Ellen Clevenger on behalf of the appellant in this case, Mr. Alfie Mays. Appellant Alfie Mays is a 12-year, was a 12-year employee of the Galveston County Sheriff's Office who filed suit against his employer under Title VII. During the period of appellant's employment before the actions that gave rise to this case, he had never been subject to serious disciplinary actions. He sued, filed suit against his employer, first having filed a complaint with the EEOC and that complaint having been resolved. He filed suit. His employer received notice of the filing of suit on November 18th of 2021, shortly after the appellant's employer received notice of the filing of that lawsuit. Two serious disciplinary actions were instituted against the appellant. So why isn't the incident on January 11, 2022 a reason, why isn't that an appropriate decision to have terminated your client on that? Your honor, respectfully, termination is not not termination. Adverse employment action. Adverse employment action. Yes, your honor. In this instance, Mr. Mays was actually assigned to supervise a section of the Galveston County Jail. There was an inmate in the Galveston County Jail and during appellant's rounds to hand out food to the inmates in the pod, he noticed that this particular inmate was tearing up some cloth. He subsequently, during the process of passing out meal trays, checked on this inmate multiple times. Even by his supervisor's report, it was 1008, I believe, or 1058, 1110. And then at 1120, Mr. Mays additionally says that he checked on the inmate in between 1110 and 1120. He continued and passed out meals to the remaining inmates in the pod, came back and checked on the inmate finally at 1130, noticed that the inmate who had previously had cloth draped around his neck was ripping up some more material and draping it around his body and he then called for backup. The disciplinary action was instituted by Sergeant Jarma, an individual who was Mr. Mays' supervisor and who had made racist and derogatory comments to Mr. Mays previously in the course of his employment. And on the same day as this incident happened, Sergeant Jarma submitted a memo to various supervisory personnel at the jail indicating that Mr. Mays had knowledge of an ongoing suicide attempt and didn't do anything about it for an inexcusable amount of time. There's actually not evidence that this was, in fact, a suicide attempt. The reports that were actually rendered by people responding, including Mr. Mays, indicate that there was material loosely draped around this inmate, that he was tearing up material. There was no knot. It was not tied and the investigator determined there was no crime. Medical personnel determined that this inmate was, in fact, okay and when Mr. Mays ultimately called for backup at 1130, he indicated that it was not an emergency situation because this particular inmate was not in any danger, not in any threatening situation. Sergeant Jarma's report is consistent with that to the extent that he notes when he entered the cell, the material was very loose. He was able to pull it away from, put his fingers underneath the material and cut through the material that was around the inmate with his county-issued scissors. Was it around his neck? It was draped around his neck like a scarf, according to the report. So it was loosely draped. It was not tied. There was no knot in the material in any place. So why did the district court err here? Well, in this instance, both the factual accounts, we don't have anything from the Galveston County Sheriff's Department that indicates a policy defining suicide attempt. It doesn't actually say that this is, there's no indication other than Sergeant Jarma's conclusory report that this was, in fact, a suicide attempt. There is no evidence of any policy in the record that indicates that there is a need to classify this particular type of action as a suicide attempt. It was based on the evidence that's in the record and based on Mr. May's judgment, not an emergent situation. He did check on this inmate multiple times throughout the course of his passing out meal trays and ultimately determined that this inmate wasn't in any danger. And in fact, he was correct about that. So Sergeant Jarma. What other purpose could there be for an inmate ripping up fabric and draping it around his neck? Can't a scarf be used to asphyxiate without having a knot in it? Well, respectfully, Your Honor, I would say as a full-time public defender for Harris County for the mentally ill, that there are multiple reasons why somebody might tear up fabric and drape it around their body. Attention-seeking. It's not necessarily suicide. It's consistent with erratic behavior. There are a number of other reasons why somebody might do that. And in fact, the medical personnel that responded seemed to indicate that he was, in fact, attention-seeking. Did Mr. Mays have any sort of training to allow him to make that determination before the medical personnel saw the inmate? I mean, I believe his training would indicate that when there's just material on somebody's body, if it's the same as somebody's wearing a shirt, they're not necessarily automatically a suicide. It's not necessarily something that needs to be immediately addressed. He wasn't in any danger. He wasn't... I'm not understanding. I'm sorry if I'm not understanding. Sure, sure. Let me ask it this way. Was it Mr. Mays' determination to make? In other words, you've got some potentially concerning behavior, don't exactly know the reason. Is it for Mr. Mays to take a wait-and-see approach or to have a professional evaluate the inmate? Mr. Mays did, in fact, have a professional evaluate the inmate. I think the question in this case is just whether his delay of 10 minutes was subject to a serious disciplinary action. Again, he was checking on this inmate pretty frequently throughout this period of time and then ultimately did call for backup. At the time that he called for backup, it was not an emergency situation. As far as he could see, the inmate was not in any immediate danger, but he did call for medical and assisting officers to come check him out to make that determination. Okay, so back to the big picture. What is the evidence demonstrating that the county stated reasons for disciplining Mr. Mays were false? I think that the court's reasoning in the case that's cited in the brief, the Laxton case, is instructive in this regard. I believe that Mr. Mays' response, in addition to the factual accounts that were given by responding Jarma, all indicate that this inmate was not in any immediate danger. They all indicate that Mr. Mays was checking on this inmate frequently and that he was actually safe and well and unharmed when medical personnel did arrive and that Mr. Mays was engaged in passing out meals to the inmates in the pod and called when he completed that task, but that there was no danger to this inmate in the case stated. We don't have any policy that specifies, you know, if you see any signs of anything that could potentially lead to an inmate harming themselves, you have to immediately call for backup. You're not permitted to use your discretion, check on them, and then call, you know, in a few minutes. I don't think there's... If it's just a difference of opinion about what should be done in that situation and whether his judgment was correct or not, why isn't that the kind of thing that's left entirely in the employer's discretion? We're not supposed to be macro-managing what should be the policies or the actions in those kind of... in the jail situation. So why would we not defer in that case unless you've showed that it was false, that this maybe was a made-up incident or something? It's a difference of opinion as to what was the appropriate response. In a sense, Your Honor, that's correct, but I think part of the issue is that we're working backwards from the conclusion that it was a suicide attempt, which colors everything else. But even if it was not a suicide attempt and they wrong... they were mistaken and it wasn't actually a steward's... they still think that you should have... that she should have been more proactive. That's... they're entitled to think that, aren't they? That they can say, we would prefer you err on the side of the caution anytime there's something that was... is this odd or strange and you need to take action and we don't think you took good enough action. And we... they disagree about the facts and he may have been right ultimately that it wasn't... but they can say, we wanted you to be more proactively. And that's... even if there... even if it never was a suicide attempt, that's why we have this... you know, we sometimes talk about whether we should have these burden shiftings and things, but that's part of baked in to the system that we have, is that you... that you have to show that it's not... it's false, not just that it's over... you know, that it's not the best policy or it's not what we would do. It has to be false as a pretext, doesn't it? Well, respectfully, Your Honor, I think that's true to an extent. However, in this particular instance, an administrative action report was specifically requested and instituted for the first time in Mr. May's 12-year employment history. Prior to that, disciplinary write-ups are typically instituted by an employee conference report. I think they call them ECRs, where the supervising officer instructs the employee, this is what you did wrong, you need to take this and this corrective action. The employee is provided with a copy of that. It then goes into the employee's file and it is not escalated to the serious level of an administrative action report. Here we have two administrative action, disciplinary actions, that were instituted about seven weeks after the employer had been served with notice that Mr. Mays had filed suit against his employer. Additionally, Your Honor, the evidence in the record, and I apologize to the court, I noticed that I miscited the record citations, but Mr. Mays was actually... if it were true that the employer were making this judgment call, as in Laxton, there's a common-sense argument to be made that can be instructive in determining pretext, which is that if on December 19, 2022, Mr. Mays actually took action that placed an inmate's life in danger, why in the world would the employer not have immediately notified him and taken action to protect that inmate from supervision by Mr. Mays, which they did not do for almost a month until January 11th of 2022. Mr. Mays was again assigned to work in that same area with that same inmate just three days later on December 22nd of 2021, and the record indicates that is in Mr. Mays' declaration and in his complaint to the EEOC. Is Mr. Mays disputing the underlying facts upon which these write-ups were based, or is he disputing the conclusions that the employer drew based on undisputed facts? He is disputing that the conclusion... the conclusions that the employer drew based on facts that are... they're... they're contradictory. I don't think that the facts are necessarily undisputed. Some of the facts are undisputed. Yes, that is correct, particularly with respect to the December 19th, 2021 incident. I think where the facts actually conflict more are with respect to the incident that occurred on January 11th of 2022. But again, it's the reason why, and I understand that it's not the same standard of review because it's this court reviewing the district court's judgment as a matter of law, but in the Laxton case, the plaintiff employee actually admitted that she had committed policy violations. She just contested that they were as egregious as the employer made them out to be, that they did not actually warrant the level of adverse action that was taken against her, which in that case was, of course, termination. And that's one of the things that the court considered in determining whether or not there was pretext. And then the court also considered the common-sense notion, which here again is if there was such a immediate danger to this inmate, why would Mr. Mays have been assigned to work in this same area with the same inmate? I know your time is... it's already run, but are you relying on the cat's-paw theory of liability in this appeal? It may be applicable, Your Honor, and so far... Because it's in your brief. Yes, Your Honor. And you haven't said it yet today. I have not. So are you... And did... if you are relying on it, did you raise that in the district court? We did not raise that in the district court, Your Honor. I think that it's indicated by the facts in the response to summary judgment in the district court and so far as the Administrative Action Committee appears to have wholly adopted the conclusions that were put forth by Sergeant Jarma in both of these administrative actions, both of these disciplinary actions. Thank you. You saved time for rebuttal. Okay, thank you, Your Honor. Good morning. May it please the Court. Robert Booth on behalf of the appellee Galveston County. This appeal asks one straightforward question. Did appellant raise a genuine fact issue on but-for causation when the county produced contemporaneous video corroborated policy-based reasons for every challenged disciplinary actions? In the trial court, Mr. Mayes did not. The district court correctly granted summary judgment and that judgment should be affirmed. The case reduces. I have a question about the judgment. Yes. It's pretty short. Yes. It's not clear to me that it says that... I guess it's saying that the legitimate non-discriminatory reasons were proven. So is it saying that the plaintiff failed to establish pretext but it doesn't say anything about pretext? It's just an odd... it stops prematurely before saying and no pretext was shown and so that's... it's hard to know whether the court looked at the pretext argument. So can you help me with the judgment? Yes judge. So remember this is a second case. There was a memorandum opinion from the prior case which went through all of the about 20 ECR reports and found no fact issue on that. As far as this judgment, the court is essentially saying it's the same thing. They haven't established... there was no evidence of a alleged... Well isn't she saying... isn't that her whole argument that this Sergeant Jarma has it out for her client and that he's no... I mean just allegedly racist towards her client and that that's what what this is all about and that it's him doing this to her client. Isn't that the... and that is a pretext and that this is all Sergeant Jarma on a... trying to hurt her client. So that is a pretext and that there's really not a basis for the write-ups that he's done. That to me is a... isn't that just a textbook example of a pretext? That he has another reason and that these things are fake, that he's writing up and they're not really... that he didn't really do these things and then that's so that the argument is a pretext thing and so you'd have to say does he have evidence that it's pretext. So the claim pretext here or the claim retaliation is that a prior lawsuit was filed. It's not that Sergeant Jarma holds some sort of racist... Well it's in the brief of that. It's definitely in the brief, but there's a disconnect there because the retaliation claim is that there was a prior claim filed. Like for example, in the Zamora case, in that case there was evidence of a code of silence. I think that's a firefighter case and so in that case there was a evidence that you broke a code of silence and so there's retaliation for that. That's not in this case. There's nothing in this record that Sergeant Jarma was concerned, aware or about the prior lawsuit which had already been dismissed by the time that this case is filed and so it just has... there's there's just no reasonable connection there and the fact that in that really bleeds your honor over to the cat's paw theory which I believe is waived and then second the claim for retaliation for filing the suit is not a racial animus case and third the marriage chain is broken and Staub requires that the biased subordinate act is approximate cause of the discipline. Here the AAC independently reviewed the file, the video, the policy citations, actually rejected Sergeant Jarma. I think you heard earlier that the policy or the committee adopted Sergeant Jarma's complaint. That's not what the record shows. That they actually modified the penalties that were assessed against against Deputy Mays. Wouldn't it have been a little bit easier for us if the district court had just explained some of this? Well in hindsight of course the judge... There's nothing it doesn't say and there was no pretext shown or there was no it just does it just stops. Well that would be a necessary finding for the court's order and so I think would be implied when the court dismisses the case. Yeah it's just important but it just seems like you shouldn't imply the main thing that you're looking for. I'm baffled by the court's order here. Hey and I don't think you're saying that the court's order is a model order of employment discrimination law are you? I'm not. But you're saying it's good enough for what we're doing here today. No reversible error. The subordinate judgment should be affirmed. Yes judge. And so I do want to correct a few things talking about the incidents that were discussed earlier. Remember there are three incidents here that Mr. Mays, Deputy Mays is being administratively written up for. He previously did not have a clean record. He had something like, it's in the record on this appeal, 20 employee conferences and memos and the three violations in this case are serious violations. The December violation involves basically a failure to respond to someone who was in the suicide prevention wing of the jail. The video evidence there independently shows that Mays waited about 10 minutes before going to render aid. The idea that this was not a suicide I think is belied by the record. If you look at the record of appeal at 206 that's an email where it says that the photo attached to 208 is enough to document the suicide attempt. Does it even matter whether it was a suicide attempt or not? Does it have to be a suicide attempt for them to take more proactive, in the suicide watch unit, can they be more proactive than to wait for the actual attempt? I think you're correct Chief Judge, is that that was what the write-up was for and it was basically written up for a collective duty. There's evidence in the record that Sgt. Jarmus said that the jailers had gone through extensive suicide prevention training, oral training, in the days leading up to the incident. So it would not, would it or would it not create a fact issue if there was some evidence that it was a suicide attempt and some evidence that it wasn't? Does it even matter? No fact issue on that, yeah. But I do raise that because there is, you heard an argument that there was a delay in the write-up and that allowed Mays to work in the jail and remember the event happened on December 22nd. That happened before the formal investigation and the discipline process even started. The disciplinary notes came on January 11th, continuing assignment for Mays until the investigation concluded it's an ordinary administrative course that's not envisioned that the underlying delay did not happen and it has nothing to say about the video or policy violations. Turning to the second incident, this I think is a more serious violation. This is the January incident. This is the failure to assist during an inmate altercation. In this incident, inmate Reed refused commands, went upstairs and Deputy Dunn pursued the video confirmed that Mays remained at the base of the stairs for 78 seconds while Deputy Dunn struggled with an inmate alone. That was a policy violation under policy C.2L or I for cowardice and a failure to perform duty. That's at Record of Appeal 123. Again, the AAC independently reviewed the recommendations and which had initially recommended a termination of Deputy Mays and that was reduced to a five-day suspension and a 90-day probation. There's a third incident that was not briefed in the appeal and that's a use of force violation. This is almost a year later in August of 2022. Mays entered a cell during a linen exchange, kicked an inmate and after being struck repeatedly punched the inmate in the face with closed fists while fellow deputy held the inmate's legs. This is described at Record of Appeal 126. Multiple sustained findings, there was a violation of cell-by-cell procedure, force beyond what was objectively reasonable and then most important, failure to make a supervisory notification or proper reporting of the use of force. That, again, was independently reviewed and the AAC upheld it. Interestingly, even though the AAC upheld the termination in that case, it then was appealed further to the sheriff. The sheriff retained Mays and undid the termination. Those are three separate incidents that indicate that the committee and the sheriff's ultimate termination of the discipline to be handed out to Deputy Mays was not just wholly adopted from what was reported from Sergeant Jarma. I do want to address the Lackson case. That was a heavy part of the appellants briefing. Lackson was a case involving the pregnancy discrimination against GAP, which was an actually a jury verdict and involved six-week pattern of fabricated, wholly fabricated complaints, a discharge with no warning and zero contemporaneous documentation despite a rigorous record-keeping policy. That's completely the opposite of what we have here. Here, each AAR is tied to specific dated incident and a specific policy violation. Those incidents are corroborated by video, which is independently reviewed by the AAC and each and the AAC modify the disciplinary actions. Also, I should point out that Lackson was decided before Nassar announced the but-for causation on retaliation. I don't think that can substitute for the requirement that the Supreme Court has put out in Nassar. Do you have anything else? I don't, Judge. Thank you. Thank you very much. We have your argument. I just like to briefly address a couple of points made by Mr. Booth, Your Honor. I guess I'll start with the last point first on the Lackson case. It is offered to this court in the context of the analysis of pretext. In that case, the allegations against the plaintiff were not, in fact, wholly fabricated. In fact, the plaintiff admitted that she had violated policy. She just explained that the policy violations were not as egregious as her employer held out that they were and that they were not actually the real reason for her termination. Yes, it's post-Nassar, but it still goes to pretext, which is precedent or it's before. Pre-Nassar. Yes, but the pretext analysis comes before the but-for analysis or hand-in-hand with the but-for analysis. It's not changed by Nassar. With respect to the district court's judgment, the district court's judgment actually states something that does not imply that there was no pretext. It says that the county has conclusively proved that its allegations had legitimate non-discriminatory reasons for taking these disciplinary actions. It's a strong statement that there isn't pretext. Because it's just their explanation is absolutely checks out, basically, and so therefore there is no pretext. That is one way of reading it, Your Honor. The other way of reading it is that it's stopped short. Well, it would have been better had the district court had said that. But it doesn't actually get to the prong of whether there is pretext. If it's so conclusive that it's absolutely believable and there's nothing to it, then there is no pretext. I mean, it's saying there's not a pretext. And so that's why we asked you what the pretext was. Right, Your Honor? The pretext was the result of the fact that these were very serious disciplinary actions, one of which resulted in a recommendation for Mr. May's termination, as pointed out by counsel. The employee conference reports that Mr. Booth mentioned that had previously been in Mr. May's kind of long employment history, they're the norm for policy violations. And so when we have something that may or may not be classified as a suicide attempt, the reason that's important is because this inmate was not actually in any danger. The inmate was fine. So insofar as it's a discretionary thing, why wasn't it an employee conference report? Because they didn't want to do all's well that ends well here. They wanted to say this is the suicide unit and you need to be more proactive. I mean, isn't that... Which would have been appropriately addressed by an employee conference report, Your Honor? It seems like you're quibbling over what the discipline was, not whether or not there was a basis for imposing discipline. I don't know. I think it's... I don't think that there was actually a basis. I think there's an argument that could be made that there wasn't a basis for imposing discipline. However, I'm conceding to the court's argument there's perhaps a discretionary call that could be made there which would have been appropriately the subject of an employee conference report. Additionally, there was a report made directly to various supervisory personnel by Sergeant Jarma on the day that this happened, on December 19th, 2021. So the administration was well aware of everything that had happened on that day and yet they assigned Mr. Mays to work in that same area on December 22nd, three days later. So if it were so serious that it warranted the most serious type of disciplinary action that the department has, one would certainly think that Mr. Mays would have been removed from that area. Wouldn't that argument have more force if it was the only write-up? I don't know, Your Honor. I think that there... I think that if the facts are examined with respect to the two administrative action report that are done later, I think if the underlying facts are examined on those that it's sort of like a patting the file, like Mr. Mays has been determined to be a problem because he has filed a complaint, he's filed a suit against this employer, and so now let's make all that we can out of these. We're gonna tag them as violations of policy. Kicking an inmate is not a violation of policy. Your Honor, no, it is not actually in certain situations. Mr. Mays noted in his responsive report that this particular inmate had struck him, hit him first, had actually aggressively advanced on him. This inmate was known to be violent to officers and was refusing to turn over his bed linens. So Mr. Mays came into the cell and correctly cited that officers are permitted to upgrade one level of force from the force that the inmate is using in order to subdue the inmate. So in certain instances, it's not, and then I would also note for the court that there is disparate treatment in the department on that issue, and there's an article actually attached to the response to the motion for summary judgment in district court talking about a Sergeant Wunderberger who was employed with the Galveston County Sheriff's Office for many years and had 33 incidents of abuse, like unlawful use of force, and was not in fact terminated until after he was indicted for killing an inmate in 2020. And so this is, you know, there's some disparate treatment that's happening in this respect. Thank you. We have your argument. Thank you, Your Honor. The court appreciates both arguments in this case. The case is submitted. The court will stand adjourned pursuant to the usual order. The court will stand adjourned pursuant to the usual order. The court will stand adjourned pursuant to the usual order. The court will stand adjourned pursuant to the usual order. It's just so weird when I think about it, it's just so easy to be helping people. Oh yeah, for sure. Because that's what we need to do. Try not to miss being a good child. It's just a little sad. I guess it's like an 80% thing to do. I guess it's like an 80% thing to do. I guess the numbers don't change in the break room. The attorney was waiting there and it didn't change. This morning, we started a new audio system recently. So hopefully you don't have that problem here. Apologize to the court.